**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**July 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

C1.G, on behalf of his minor son, C.G., the
aggrieved party,

     Plaintiff - Appellant,

v.

SCOTT SIEGFRIED, Superintendent of
Cherry Creek School District; CHRIS
SMITH, Chief of Staff for the Educational
Services Center of Cherry Creek School
District; RYAN SILVA, Principal of
Cherry Creek High School; KEVIN
UHLIG, Assistant Principal at Cherry
Creek High School; BRYNN THOMAS,
Dean at Cherry Creek High School;
CHERRY CREEK SCHOOL DISTRICT
NO. 5; CARLA STEARNS, Executive
Director of High School Education at
Cherry Creek School District,

     Defendants - Appellees.

--------------------

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
OF COLORADO; FOUNDATION FOR
INDIVIDUAL RIGHTS IN EDUCATION;
CATO INSTITUTE; ELECTRONIC
FRONTIER FOUNDATION; NATIONAL
SCHOOL BOARD ASSOCIATION;
COLORADO ASSOCIATION OF
SCHOOL BOARDS; KANSAS
ASSOCIATION OF SCHOOL BOARDS;
NEW MEXICO SCHOOL BOARDS

No. 20-1320

ASSOCIATION; WYOMING SCHOOL
BOARDS ASSOCIATION; UTAH
SCHOOL BOARDS ASSOCIATION,

        Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-03346-RBJ)**

_____

Jamie Hubbard of Stimson, Stancil, LaBranche, Hubbard, L.L.C. (Andrew McNulty of Kilmer, Lane & Newman, L.L.P., with her on the briefs), Denver, Colorado, for Plaintiff - Appellant.

Jonathan Fero, (and M. Johnathan Koonce of Semple, Farrington, Everall & Case, P.C., on the brief), Denver, Colorado, for Defendants - Appellees.

Vera Eidelman (and Ben Wizner of American Civil Liberties Union Foundation, New York, New York; Mark Silverstein and Sara Neel, American Civil Liberties Union of Colorado, Denver, Colorado, with her on the brief), for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Colorado.

Ilya Shapiro of Cato Institute, Washington, D.C.; Darpana Sheth and Ronald G. London of Foundation for Individual Rights in Education, Philadelphia, Pennsylvania, on the brief for Amici Curiae Foundation for Individual Rights in Education and Cato Institute.

Sophia Cope, David Greene and Mukund Rathi of Electronic Frontier Foundation, San Francisco, California, on the brief for Amici Curiae Electronic Frontier Foundation.

Francisco M. Negrón, Jr., Chief Legal Officer, of National School Boards Association, Alexandria, Virginia; W. Stuart Stuller of Caplan and Earnest, L.L.C., Boulder, Colorado, on the brief for Amici Curiae National School Boards Association, et al.

_____

Before **MATHESON**, **KELLY**, and **McHUGH**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Plaintiff-Appellant Cl.G., on behalf of his minor son, C.G., appeals from the district court's dismissal of his case against Defendants-Appellees Cherry Creek School District (District or CCSD) and various employees thereof for alleged constitutional violations stemming from C.G.'s suspension and expulsion from Cherry Creek High School (CCHS).  Cl.G. v. Siegfried, 477 F. Supp. 3d 1194 (D. Colo. 2020).  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## Background

On the evening of Friday, September 13, 2019, C.G. was off campus at a thrift store with three friends.  Cl.G., 477 F. Supp. 3d at 1200.  He took a picture of his friends wearing wigs and hats, including "one hat that resembled a foreign military hat from the World War II period."  Id.  C.G. posted that picture on the social media platform Snapchat and captioned it, "Me and the boys bout [sic] to exterminate the Jews."  Id. (quoting Aplt. App. 46).  C.G.'s post (the photo and caption) was part of his private "story," an online feed visible only to Snapchat users connected with C.G. on that platform.  Aplt. App. 45–47.  Posts on a user's Snapchat story are automatically deleted after 24 hours, but C.G. removed this post after a few hours.  Cl.G., 477 F. Supp. 3d at 1200.  He then posted on his Snapchat story, "I'm sorry for that picture it was ment [sic] to be a joke."  Id. at 1200–01.

One of C.G.'s Snapchat "friend[s]"[1] took a photograph of the post before C.G. deleted it.  Id.  at 1201.  She showed it to her father, and he called the police, who visited C.G.'s house and found no threat.  Id.  Referencing prior anti-Semitic activity and indicating that the post caused concern for many in the Jewish community, a CCHS parent emailed the school and community leaders about the post.  Id.

On Monday, September 16, 2019, Dean of Students Brynn Thomas told C.G. that he was suspended for five days while the school investigated.  Id.  Two days later, the school extended C.G.'s suspension five days to facilitate an expulsion review, and then another 11 days to allow for completion of that review.  Id. at 1202. On October 7, 2019, CCSD held an expulsion hearing, and the hearing officer recommended expulsion.[2]  Id. at 1202–03.  Fourteen days after the hearing, Superintendent Scott Siegfried informed C.G. that he was expelled for one year for violating District policies:

> (1) JICDA(13) prohibiting verbal abuse in a school building or on school property (overruling the hearing officer's finding that JICDA(13) did not apply);
> (2) JICDA(19) regulating "behavior on or off school property which is detrimental to the welfare, safety or morals of other students or school personnel";

---

[1] "Friends" on Snapchat are users who have connected on the platform and can therefore see one another's "private" stories.

[2] C.G.'s parents provided the school with: (1) "a letter from C.G. accepting full responsibility[,] . . . apologizing for his behavior, explaining that it was an impulsive lapse of judgment not intended to hurt anyone, and stating that he had recently spent time educating himself about Jewish history and talking with Jewish community members and advocacy groups"; (2) "a letter from C.G.'s parents reiterating C.G.'s journey of education and reticence"; and (3) "letters from community members who know C.G. and his family requesting that CCHS turn this into 'a learning opportunity.'"  Cl.G., 477 F. Supp. 3d at 1202.

> (3) ACC-R prohibiting intimidation, harassment, or hazing by directing an obscene comment or gesture at another person or insulting or challenging another person or by threatening another person; and
> (4) JKD-1-E, which allows for suspension, expulsion or denial of admission for behavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel including behavior that creates a threat of physical harm.

Id. at 1203 (quoting Aplt. App. 57).  Upon C.G.'s appeal, the Board affirmed the Superintendent's decision.  Id.

Plaintiff filed suit under 42 U.S.C. § 1983 claiming: (1) violations of C.G.'s rights under the First and Fourteenth Amendments against CCHS/CCSD officials for C.G.'s suspension and expulsion; (2) the same violations against the District for adopting policies in violation of the First Amendment; (3) violations of C.G.'s Fourteenth Amendment procedural due process rights against all Defendants for C.G.'s suspension and expulsion; (4) the same violations asserted in claim (3) against the District for adopting policies in violation of the Fourteenth Amendment; and (5) violations of the First and Fourteenth Amendments against all Defendants for conspiracy to violate C.G.'s constitutional rights.[3]  Id. at 1204.

Defendants filed a motion to dismiss Plaintiff's Amended Complaint (Complaint) for failure to state a claim under Federal Rule of Procedure 12(b)(6) or to grant individual Defendants qualified immunity.  See Aplt. App. 73–87.  The district court determined that Tinker v. Des Moines Independent Community School

---

[3] Plaintiff originally included the District's Board of Education as a Defendant, but having already named the District as a party, Plaintiff later dismissed the Board as redundant.  Cl.G., 477 F. Supp. 3d at 1204.

District, 393 U.S. 503 (1969), applied to off-campus speech, though it noted that the pervasiveness of social media had limited the utility of the distinction between off-campus and on-campus speech.  Cl.G., 477 F. Supp. 3d at 1204–06.  The district court held that it was foreseeable that C.G.'s post could cause substantial disruption and interfere with the rights of others.  Id. at 1209–10.  Concluding further that "the school did have authority to discipline C.G. for his Snapchat post" and CCSD's policies were facially valid, it dismissed Plaintiff's First Amendment claims.  Id. at 1208–11.  Finding that Defendants had provided adequate process in disciplining C.G. and that Plaintiff had abandoned his facial challenge to the District's policies, it also dismissed Plaintiff's due process claims.  Id. at 1211–16.  Last, the district court dismissed Plaintiff's conspiracy claim for lacking a constitutional violation.  Id. at 1216.

On appeal, Plaintiff argues that the First Amendment limits school authority to regulate off-campus student speech, particularly speech unconnected with a school activity and not directed at the school or its specific members.  Plaintiff relies heavily on Mahanoy Area School District v. B.L., 141 S. Ct. 2038 (2021), decided after the district court's decision in this case.  According to the Plaintiff, Mahanoy reaffirmed existing principles that a school normally cannot regulate off-campus student speech, so the individual Defendants are not entitled to qualified immunity.  Plaintiff contends that CCSD's policies are facially unconstitutional and overbroad because they do not incorporate this distinction.  Finally, Plaintiff argues that C.G.'s due

process rights were violated because he was not afforded adequate notice or

opportunity to be heard regarding his suspensions and First Amendment rights.

Defendants maintain that C.G. was lawfully disciplined for what amounts to

off-campus hate speech. According to Defendants, although originating off campus,

C.G.'s speech still spread to the school community, disrupted the school's learning

environment, and interfered with the rights of other students to be free from

harassment and receive an education. Defendants also contend that C.G. was

provided all the process that was due.

## Discussion

We review dismissal under Rule 12(b)(6) for failure to state a claim de novo.

Reznik v. inContact, Inc., 18 F.4th 1257, 1260 (10th Cir. 2021). In this review, we

accept a complaint's well-pleaded factual allegations as true, "view all reasonable

inferences in favor of the nonmoving party, and liberally construe the pleadings." Id.

If a complaint "state[s] a claim to relief that is plausible on its face," it survives a

Rule 12(b)(6) motion. Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)).

### I. Regulation of Student Speech

Schools may restrict student speech only if it "would substantially interfere

with the work of the school or impinge upon the rights of other students." Tinker,

393 U.S. at 509; Thompson v. Ragland, 23 F.4th 1252, 1258 (10th Cir. 2022). A

school can also regulate student speech where it reasonably forecasts such disruption.

Thompson, 23 F.4th at 1256. "[S]pecial characteristics call for special leeway when schools regulate speech that occurs under its supervision." Mahanoy Area Sch. Dist. v. B.L., 141 S. Ct. 2038, 2045 (2021). But in considering student speech that occurs off campus and is unconnected to any school activity, a school: (1) can "rarely stand in loco parentis"; (2) "will have a heavy burden to justify intervention" when political or religious speech is involved; and (3) must especially respect "an interest in protecting a student's unpopular expression." Id. at 2046.

The Mahanoy Court "d[id] not . . . set forth a broad, highly general First Amendment rule stating just what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, e.g., substantial disruption of learning-related activities or the protection of those who make up a school community." Id. at 2045. Instead, it identified the above "three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech." Id. at 2046.

Mahanoy "provide[s] one example" of "where, when, and how these features mean the speaker's off-campus location will make the critical difference." Id. In Mahanoy, minor student B.L. posted two photos on her Snapchat. Id. at 2043. The first photo showed B.L. and a friend raising middle fingers and was captioned: "Fuck school fuck softball fuck cheer fuck everything." Id. The second photo was blank and captioned: "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" Id. Fellow

8

students who were B.L.'s friends on Snapchat could see this post.  Id.  The images circulated, and B.L. was suspended from the junior varsity cheerleading squad.  Id.

The Court first analyzed B.L.'s speech and determined that it "did not involve features that would place it outside the First Amendment's ordinary protection."  Id. at 2046–47.  The Court found it important that B.L.: (1) spoke "outside of school hours from a location outside the school"; (2) "did not identify the school in her posts or target any member of the school community with vulgar or abusive language"; and (3) "transmitted her speech through a personal cellphone, to an audience consisting of her private circle of Snapchat friends."  Id. at 2047.  The Court explained that these features, "while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing B.L.'s utterance."  Id. (citation omitted).

The Court then weighed the school's possible interests in prohibiting B.L.'s speech.  Id. at 2047–48.  That B.L.'s speech was, "[g]eographically speaking, off-campus speech" rendered insufficient the validity of her school's "anti-vulgarity interest" and meant that the school did not stand in loco parentis.  Id. at 2047.  Also, some students being upset by the post and discussing it during class for a few days "d[id] not meet Tinker's demanding standard" of "'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action."  Id. at 2047–48 (quoting Tinker, 393 U.S. at 514).  Mahanoy clarified that risk of transmission to the school does not inherently change the off-campus nature of all speech on social media.  Id. at 2047.

Mahanoy's framework for assessing school regulation of off-campus speech on social media controls our analysis here.  In many respects and based on the Complaint, this case is materially similar.  Like B.L.'s speech, C.G.'s speech would generally receive First Amendment protection because it does not constitute a true threat,[4] fighting words, or obscenity.  See id. at 2046–47.  Defendants argue that C.G.'s post is uniquely regulable because it is "hate speech targeting the Jewish community" and "not just a crude attempt at a joke about the Holocaust."  Aplee. Br. at 20.  But offensive, controversial speech can still be protected.  See Mahanoy, 141 S. Ct. at 2055–56 (Alito, J., concurring).

Like B.L., C.G.: (1) spoke "outside of school hours from a location outside the school"; (2) "did not identify the school in [his] post[] or target any member of the school community with vulgar or abusive language"; and (3) "transmitted [his] speech through a personal cellphone, to an audience consisting of [his] private circle

_____

[4] True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  Virginia v. Black, 538 U.S. 343, 359 (2003).  "[A] reasonable person in the circumstances [must] understand [the statement] as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another."  United States v. Dillard, 795 F.3d 1191, 1200 (10th Cir. 2015) (quoting United States v. Heineman, 767 F.3d 970, 972 (10th Cir. 2014)).  "[T]he threat must be a serious one, 'as distinguished from words as mere political argument, idle talk or jest.'"  Heineman, 767 F.3d at 972–73 (quoting United States v. Viefhaus, 168 F.3d 392, 395 (10th Cir. 1999)).

As Plaintiff pointed out at oral argument and in the Complaint, school officials apparently did not consider C.G. to have authored a threat.  On the Monday morning following his post, C.G. drove himself to school, parked in the school parking lot, and walked past security to his first-period class with his backpack (which was not searched) before he was escorted to Dean Thomas's office.  Aplt. App. at 48.

10

of Snapchat friends." Id. at 2047 (majority opinion). These characteristics of C.G.'s speech, "while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [his] utterance." Id. (citation omitted).

Further, like the school in Mahanoy, CCHS's possible interests in prohibiting C.G.'s speech would not defeat his First Amendment protections. See id. at 2047–48. Defendants argue that their disciplinary actions were appropriate because they "must consider the rights of other students to be free from harassment and receive an effective education." Aplee. Br. at 21–22. But the school cannot stand in loco parentis here. That doctrine applies "where the children's actual parents cannot protect, guide, and discipline them." Mahanoy, 141 S. Ct. at 2046. Mahanoy is clear that schools may not invoke the doctrine to justify regulating off-campus speech in normal circumstances. See id. Based on the Complaint, there is nothing abnormal in this case to prevent following this rule.

Next, CCHS argues that it had a reasonable expectation of substantial disruption (which it claims did in fact occur) and/or interference with other students' rights to access education[5] under Tinker. Aplee. Br. at 16–22; Aplt. App. 77–79. First, Defendants provide the following reasons to support a reasonable forecast of substantial disruption regarding C.G.'s initial suspension: (1) that Principal Ryan Silva received emails about the post; (2) that the post had been widely circulated

---

[5] Defendants do not develop an argument for interference with other students' rights, so we address only their substantial disruption arguments. See Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007).

throughout the area's Jewish community; and (3) that the post had scared, angered, and saddened a family who said their son was worried about having a class with C.G. Aplt. App. 74–75.  After the initial suspension, Defendants stress that: (1) Principal Silva sent a message to CCHS students, parents, and staff; (2) news outlets covered the incident; (3) three more parents contacted CCHS; and (4) CCHS used one advisory period to discuss C.G.'s post and promote conversation about harmful speech.  Aplt. App. 51, 75–76.

These facts do not support a reasonable forecast of substantial disruption that would warrant dismissal of the Complaint.  See Mahanoy, 141 S. Ct. at 2047–48. CCHS only provides an email chain with one family.  Aplt. App. 88–91.  Principal Silva needed more to substantiate his "feel[ing] [that] the learning environment ha[d] been impacted."  Aplt. App. 88; see Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 37 (10th Cir. 2013).  Moreover, "impact[]" does not necessarily equal substantial disruption.  Aplt. App. 88.

Defendants rely on West v. Derby Unified School District No. 260, 206 F.3d 1358 (10th Cir. 2000), to claim that the school has expertise deserving of deference and that the context of previous anti-Semitic incidents at the school[6] must be considered.  Aplee. Br. at 17–18.  But that case involved a student drawing a confederate flag on campus in a school district that had adopted a policy in response

---

[6] The record attests one previous incident: "the suspension of 3 students last December for threatening to use assault rifles to shoot the Jews."  Aplt. App. 91; Aplt. Reply Br. at 9 & n.1.

to previous racial incidents, some of which included confederate flags and the student in question.  West, 206 F.3d at 1361–63.  That case materially differs from this one because C.G. was off campus and Defendants lack documented context facilitating similar disciplinary action or previous, similar behavior by C.G.

Moreover, C.G.'s post did not include weapons, specific threats, or speech directed toward the school or its students.  Thus, even pre-Mahanoy, this case materially differs from the five cases Defendants cite to prove that other circuits have applied Tinker to off-campus speech.  Those cases all addressed specific threats directed at a school, its students, or its officials.[7]  Defendants cannot claim a reasonable forecast of substantial disruption to regulate C.G.'s off-campus speech by simply invoking the words "harass" and "hate" when C.G.'s speech does not constitute harassment and its hateful nature is not regulable in this context.

CCHS's argument that substantial disruption actually occurred is equally unconvincing.  See Aplee. Br. at 17; Aplt. App. 79.  We cannot consider CCHS's choice to discuss C.G.'s post during an advisory period (a schedule block twice a week implemented specifically for dealing with such matters) substantial disruption. See Aplt. App. 51–52.  Neither can news reports nor four emails from parents be

---

[7] See Bell v. Itawamba Cnty. Sch. Bd., 799 F.3d 379, 384–85, 389–93 (5th Cir. 2015); Wynar v. Douglas Cnty. Sch. Dist., 728 F.3d 1062, 1070–71 (9th Cir. 2013); Kowalski v. Berkeley Cnty. Schs., 652 F.3d 565, 567 (4th Cir. 2011); D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d 754, 764–65 (8th Cir. 2011); Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 35 (2d Cir. 2007).  Some of these cases may evidence the rare instance where a school could stand in loco parentis.

evidence of substantial disruption.  These facts fall short of "Tinker's demanding standard."  Mahanoy, 141 S. Ct. at 2048.

Because CCHS cannot stand in loco parentis and the Complaint alleges no reasonable forecast of substantial disruption or actual disruption, Plaintiff has properly alleged that Defendants' discipline of C.G. for his off-campus speech is a First Amendment violation that cannot be dismissed at this stage.

## II. Qualified Immunity

Individual Defendants also claim that they are entitled to qualified immunity. See Aplee. Br. at 22–23.  Because Plaintiff has properly pled a constitutional violation, individual Defendants at this time can only receive qualified immunity if their conduct was not clearly established as unlawful.  See Thompson, 23 F.4th at 1255.  The question is whether, by addressing "the defendant's conduct as alleged in the complaint," the reasonable school official would know that disciplining C.G. for posting offensive content online and off campus that did not target the school or its members was unlawful.  Id. at 1256 (quoting Behrens v. Pelletier, 516 U.S. 299, 309 (1996)).

For Plaintiff to show that the law was clearly established, there must be authority from the Supreme Court, the Tenth Circuit, or a clear majority of other circuit courts "deciding that the law was as the plaintiff maintains."  Id. at 1255.  As of September and October 2019, the Supreme Court had not yet addressed a case involving school regulation of online, off-campus speech.  The Court did not consider this issue until Mahanoy, and it did not address the question of qualified

14

immunity in that case because the school district was the only defendant. See 141 S. Ct. 2038. Before September 2019, this court had only addressed an online, off-campus speech case at a university. See Yeasin v. Durham, 719 F. App'x 844, 852 (10th Cir. 2018) (unpublished). We found that it was not clearly established that a university student could not be expelled in part for online, off-campus speech. Id.

In November 2019, weeks after C.G.'s expulsion, we noted in Hunt v. Board of Regents of the University of New Mexico "unmistakable gaps in the case law, including whether: (1) Tinker applies off campus; [and] (2) the on-campus/off-campus distinction applies to online speech." 792 F. App'x 595, 606 (10th Cir. 2019) (unpublished).[8] We thus did not find it clearly established that a university could discipline a student for offensive online, off-campus speech. Id. at 601–02. But in 2022, in Thompson v. Ragland, we determined that it was clearly established[9] that a university student could not be disciplined for "express[ing] her displeasure with [a] professor" and "suggest[ing] that her classmates leave 'honest' end of term evaluations." 23 F.4th at 1253. There, the student's speech could not be regulated on campus, so it was clearly established that regulating it off campus was unlawful. Id. at 1261–62.

---

[8] Plaintiff filed suit in this case in 2016 concerning conduct in late 2012 and resulting disciplinary action in early 2013. See Hunt, 792 F. App'x at 597–99.

[9] Even though Thompson was decided this year, it evaluated conduct that occurred in early 2019, before the conduct at issue in this case. See 23 F.4th at 1254–55.

Because the district court did not address the question of qualified immunity, we remand for the district court to consider this issue in the first instance. Underwood v. Bank of Am. Corp., 996 F.3d 1038, 1056–57 (10th Cir. 2021).

### III. Plaintiff's Facial Challenge to CCSD's Policies

Plaintiff claims that CCSD policies JICDA(13), JICDA(19), ACC-R, and JDK-1-E violate the First Amendment in permitting suspension and expulsion "for speech that occurs off-campus, unconnected to a school-sponsored event or activity." Aplt. App. 60. Our determination that C.G. has properly pled a First Amendment violation means that his as-applied challenge successfully withstands dismissal at this stage. Because "[i]t is not the usual judicial practice . . . [and not] generally desirable" to reach a facial challenge after ruling for the plaintiff on an as-applied one, we do not address C.G.'s facial challenge for overbreadth. See Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484–86 (1989). We note, however, that C.G. has waived any overbreadth argument as to CCSD policies JICDA(13), JICDA(19), and ACC-R because he did not reference or cite them in his opening brief. Aplt. Br. at 36–41; see Kitchen v. Herbert, 755 F.3d 1193, 1208 (10th Cir. 2014).

### IV. Plaintiff's Procedural Due Process Rights

Plaintiff alleges that Defendants denied C.G. procedural due process in his suspensions and expulsion. Aplt. App. 63–65. Defendants argue that C.G. demands process beyond what the Constitution requires. Aplee. Br. at 29–33.

We assess C.G.'s initial, five-day suspension under Goss v. Lopez. 419 U.S. 565, 581 (1975). For suspensions of one to ten days, a student must "be given oral or

16

written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  Id. Opportunity under Goss must be meaningful to be considered actual opportunity. West, 206 F.3d at 1364.

Plaintiff alleges that C.G. was removed from his first-period class and taken to Dean Thomas's office, where he remained for hours.  Aplt. App. 48–49.  The Complaint further claims that CCSD "officials . . . decided to suspend [him]" "[b]efore hearing anything from C.G."  Aplt. App. 48; see also Aplt. Br. at 41.  We consider it axiomatic that an opportunity for C.G. "to present his side of the story," Goss, 419 U.S. at 581, could not have been meaningful and satisfied Goss if a disciplinary decision had already been made.  Cf. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985).  Taking, as we must, these well-pled allegations as true and construing reasonable inferences in Plaintiff's favor, Reznik, 18 F.4th at 1260,[10] it is certainly plausible that C.G. was not given a meaningful opportunity to explain his side of the story before officials made a disciplinary decision.  This is all Plaintiff needs to survive a motion to dismiss on this claim.

---

[10] The district court relied upon the Complaint's allegations that C.G. was notified of the suspension and that he was in the Dean's office for hours to conclude that he had sufficient notice and an opportunity to be heard.  C1.G., 477 F. Supp. 3d at 1212.  Defendants argue that "[i]t does not take an inferential leap . . . to conclude from these allegations that [C.G.] had ample opportunity to tell his side of the story." Aplee. Br. at 30.  But on a motion to dismiss in this context, we cannot draw factual inferences against the plaintiff.  Therefore, we cannot draw the inference that C.G. had an opportunity to present his side of the story while he was in the Dean's office. See Pace v. Swerdlow, 519 F.3d 1067, 1073 (10th Cir. 2008).

Twombly, 550 U.S. at 570.  Accordingly, we reverse the district court's dismissal of this claim.

Goss also governs analysis of the five-day extension of C.G.'s suspension. See 419 U.S. at 581.  The district court found no due process violation here because it held that Defendants complied with due process requirements in meting out C.G.'s initial suspension.  Cl.G., 477 F. Supp. 3d at 1212.  Our determination that Plaintiff has plausibly alleged that Defendants violated C.G.'s procedural due process rights with the initial suspension affects that rationale and conclusion.  On remand, the district court must reconsider whether Defendants provided C.G. with a meaningful opportunity to present his side of the story.  We note some concern with the fact that C.G.'s mother — after being notified of the both the five-day and the 11-day suspension extensions — asked for a meeting with the school and was denied because there would be an expulsion hearing.  Aplt. App. 52–55.

The final suspension extension that stretched C.G.'s suspension to 21 days and C.G.'s expulsion are governed by the three-factor test from Mathews v. Eldridge, 424 U.S. 319 (1976).  See Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001).  This suspension extension "allow[ed] for completion of the expulsion review process," Aplt. App. 53, which had been under way since CCHS officials began a push for expulsion review when Plaintiff was removed from class for his initial suspension.  Aplt. App. 49, 52.

Following Mathews, we weigh: (1) C.G.'s interest in returning to school and avoiding further reputation harm; (2) the likely value of additional or substitute

procedure to allow C.G. to protest further disciplinary action and/or obtain further

consideration of his First Amendment rights; and (3) the administrative and fiscal

burden of such procedure for Defendants.  See Watson, 242 F.3d at 1240.  Plaintiff

admits that "C.G. had the opportunity to present his side of the story" at the

expulsion hearing but maintains that this "cannot sanitize the repeated constitutional

violations that came before it."  Reply Br. at 15.  Further, Plaintiff argues that

Defendants needed to consider C.G.'s First Amendment rights but ignored them.

Aplt. Br. at 45–47; Reply Br. at 15.  Defendants claim that they provided C.G. with

all required due process.  Aplee. Br. at 29–34.  Defendants assert that they considered

C.G.'s First Amendment rights, despite the fact that "the hearing officer did not make

findings on that as a matter of law."  Aplee. Br. at 32.  According to Defendants,

"factual findings are enough" because CCSD's policies reflect the proper legal

standard for regulating student speech.  Aplee. Br. at 32.

    Plaintiff's proper pleading of a due process violation, Defendants' possible

misconceptions of their ability to regulate student speech under the First Amendment,

and the district court's consequent inquiry on remand may affect the Mathews

analysis.  Accordingly, we vacate the district court's dismissal of C.G.'s further

procedural due process claims for reconsideration.  The district court may also

address claims of qualified immunity for individual Defendants, see, e.g., Brown v.

Montoya, 662 F.3d 1152, 1171 (10th Cir. 2011); Aplee. Br. at 24–25, 34–35, and in

Superintendent Siegfried's case, absolute immunity, Aplee. Br. at 35.

### V. Plaintiff's Facial Challenge to CCSD's Policies for Fourteenth Amendment Violations

The district court correctly dismissed Plaintiff's facial challenge here because he abandoned it by not addressing it in his response to Defendants' motion to dismiss. Cl.G., 477 F. Supp. 3d at 1215; see also Aplt. App. 114–30. Additionally, Plaintiff's briefing of the issue on appeal is inadequate. See Bronson, 500 F.3d at 1104.

### VI. Conspiracy Under 42 U.S.C. § 1983

The district court dismissed Plaintiff's conspiracy claim because it found that "he failed to establish a constitutional violation." Cl.G., 477 F. Supp. 3d at 1216. Because Plaintiff has properly pled a constitutional violation, we remand Plaintiff's conspiracy claim to the district court to evaluate in the first instance. Underwood, 996 F.3d at 1056–57.

### Conclusion

Plaintiff has properly pled that Defendants violated C.G.'s First Amendment rights by disciplining him for his post. Accordingly, we reverse the district court's dismissal of Plaintiff's first claim and do not reach Plaintiff's related facial challenge. We also reverse the district court's dismissal of Plaintiff's claim of a procedural due process violation under Goss for C.G.'s initial suspension. The district court's dismissal of Plaintiff's second alleged due process violation under Goss for C.G.'s first suspension extension is consequently vacated for reconsideration, as are the final suspension extension and expulsion. We affirm the

dismissal of Plaintiff's further facial challenges to CCSD's policies.  Finally, we remand the questions of qualified and absolute immunity and Plaintiff's conspiracy claim for consideration in accordance with this court's decision.